## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CLARK W. ROBERTS,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:16cv00024 |
| | ) | **MEMORANDUM  OPINION** |
| **NANCY A. BERRYHILL,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By:   PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

### I. Background and Standard of Review

Plaintiff, Clark W. Roberts, ("Roberts"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*,

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Roberts protectively filed his applications for DIB and SSI on September 21, 2010, alleging disability as of December 1, 2007,[2] due to back problems, depression and anxiety. (Record, ("R."), at 409-16, 445, 449, 478.) The claims were denied initially and on reconsideration. (R. at 232-34, 240, 244-46, 248-53, 255-57.) Roberts requested a hearing before an administrative law judge, ("ALJ"), which was held on November 28, 2012. (R. at 126-54, 258.) By decision dated January 9, 2013, an ALJ denied Roberts's claims. (R. at 209-21.) The Appeals Council remanded Roberts's case for further consideration. (R. at 227-30.) On remand, the ALJ held two hearings, on November 3, 2014, and March 16, 2015, at which Roberts was represented by counsel. (R. at 51-79, 90-97.)

By decision dated March 20, 2015, the ALJ again denied Roberts's claims. (R. at 30-44.) The ALJ found that Roberts met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2013. (R. at 33.) The ALJ found that Roberts had not engaged in substantial gainful activity since December 1, 2007, the alleged onset date. (R. at 33.) The ALJ found that the

---

[2] At Roberts's March 16, 2015, hearing, his attorney discussed the dates of disability that best supported Roberts's claims. (R. at 69.) She identified October 8, 2011, the date that an MRI of Roberts's thoracic spine showed nerve root compression, or, in the alternative, April 19, 2012, the date of Roberts's right shoulder surgery. (R. at 69.) Regardless, the ALJ found that Roberts's alleged onset date was December 1, 2007. (R. at 33.)

medical evidence established that Roberts had severe impairments, namely bilateral shoulder dysfunction; status-post arthroscopic right shoulder anterior and posterior labral repair; low back pain; gastroesophageal reflux disease, ("GERD"); hypertension; depressive disorder; and anxiety disorder, but he found that Roberts did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 33.) The ALJ found that Roberts had the residual functional capacity to occasionally lift and carry items weighing up to 50 pounds and 20 pounds continuously; sit for eight hours in an eight-hour workday, but only two hours at one time without interruption; and stand and/or walk for a total of four hours in an eight-hour workday, but for only two hours at one time without interruption. (R. at 35.)

In addition, the ALJ found that Roberts could occasionally reach overhead with his bilateral upper extremities and continuously reach in all other directions; that he could continuously handle, finger, feel, push and pull, use his bilateral lower extremities to operate foot controls, climb stairs and ramps, balance, stoop, kneel, crouch and crawl; that he could frequently climb ladders and scaffolds; that he could continuously tolerate exposure to environmental conditions, such as unprotected heights, moving mechanical parts, vibrations, extreme temperatures and pulmonary irritants; and that he would be limited to simple one- to two-step jobs with little interaction with co-workers and no interaction with the general public. (R. at 35.) The ALJ found that Roberts was unable to perform his past relevant work. (R. at 43.) Based on Roberts's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Roberts could perform, including jobs as a laundry worker, a kitchen worker and a

cleaner. (R. at 43-44.) Thus, the ALJ concluded that Roberts was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 44.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2017).

After the ALJ issued his decision, Roberts pursued his administrative appeals, (R. at 22-26), but the Appeals Council denied his request for review. (R. at 1-6.) Roberts then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). This case is before this court on Roberts's motion for summary judgment filed March 20, 2017, and the Commissioner's motion for summary judgment filed April 19, 2017.

## II. Facts

Roberts was born in 1978, (R. at 55, 131, 409, 411), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). Roberts has a high school education and past relevant work as a construction electrician and a kitchen helper. (R. at 56, 60-61, 70, 132, 450.) He stated that he had a journeyman electrician license that expired in 2014. (R. at 56.) Roberts stated that he needed assistance with getting in and out of the shower, shaving his head and, at times, drying his head and upper body. (R. at 57.) He stated that he spent 15 to 45 minutes at a time in the bathroom as a result of irritable bowel syndrome. (R. at 58, 66.) Roberts stated that he did not take any prescribed pain medication. (R. at 63.) He stated that he used a cane for stability, but that the cane was not prescribed. (R. at 63.) He stated that he could walk up to 200 feet without the use of a cane. (R. at 63.) Roberts stated that he experienced chest pains daily, and that walking caused

him to be short of breath. (R. at 67.) He stated that he did not like to be around crowds of people due to nervousness and paranoia. (R. at 68.)

Victor Faranoscus, a vocational expert, was present and testified at Roberts's hearing. (R. at 70-78.) Faranoscus was asked to consider a hypothetical individual of Roberts's age, education and work history, who was limited as indicated in the assessments of Dr. James Abrokwah, M.D.,[3] and B. Wayne Lanthorn. (R. at 71-73, 602, 1025-27.) Faranoscus stated that there would be no jobs available that the individual could perform. (R. at 73.) Faranoscus was asked to consider the same individual, but who would be limited as indicated in the assessments of Dr. Louis A. Fuchs, M.D.,[4] and Gary Bennett, Ph.D. (R. at 73-75, 1063-64, 1365-70.) Faranoscus stated that the individual could not perform Roberts's past work, but that sedentary[5] jobs were available, existing in significant numbers in the national economy, that such an individual could perform, including those of a laundry worker, a kitchen worker and a cleaner. (R. at 75-77.) Faranoscus was asked to consider an individual who was limited as indicated by the assessments of Dr. Fuchs and Lanthorn. (R. at 77.) He stated that there would be no jobs available that such an individual could perform. (R. at 77.) He also stated that there would be no

---

[3] The hearing transcript refers to the report of Dr. Avaraq found at Exhibit 4 in the record. (R. at 71.) This, apparently, is a misspelling, and the ALJ was actually referring to Dr. Abrokwah.

[4] The hearing transcript refers to the report of Dr. Hughes found at Exhibit 33 in the record. (R. at 73.) It is determined that this is a misspelling, and the ALJ was actually referring to Dr. Fuchs.

[5] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2017).

jobs available that an individual could perform should he be required to rest up to two hours a day on a regular basis or who would require unscheduled bathroom breaks during the day. (R. at 77-78.)

In rendering his decision, the ALJ reviewed records from Dr. Robert Keeley, M.D., a state agency physician; Dr. Thomas Henretta, M.D., a state agency physician; David Tessler, Psy.D., a state agency psychologist; Dr. James Abrokwah, M.D.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Dr. R. M. Bentley, D.O.; Community Physicians; Dr. Pema O. Bhutia, M.D.; University of Virginia Health System, ("UVA"); Dr. James L. Lapis, M.D.; Dr. Orson D. Go, M.D.; James Kegley, M.S.; Lonesome Pine Hospital; Norton Community Hospital; Holston Valley Hospital; Holston Medical Group; Gary Bennett, Ph.D., a licensed clinical psychologist; Dr. John N. Menio, M.D.; Wise Chiropractic and Acupuncture; and Dr. Louis A. Fuchs, M.D. Roberts's attorney also submitted medical reports from Dr. Lapis and Dr. Go to the Appeals Council.[6]

The record shows that Roberts treated at Community Physicians from 2001 through 2013 for lumbar spine pain with radiculopathy; knee, back, sciatic and shoulder pain; anxiety; depression; avoidance behavior; hypertension; dyslipidemia; GERD; right glenohumeral joint dysfunction; lumbago; bronchitis; sinusitis; headaches; abdominal pain; inguinal pain; carpal tunnel syndrome; major depressive disorder; and hematuria. (R. at 613, 616, 641-42, 646, 648, 650, 652, 684-85, 693, 696, 723, 732, 734, 924, 935, 940, 950, 1071, 1076, 1079, 1084, 1089, 1092, 1097.) In February 2006, Roberts reported that he was doing well with

---

[6] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Paxil. (R. at 616.) In February 2011, Roberts reported that he was tolerating his medications without any side effects. (R. at 950.) He reported that his GERD was doing better. (R. at 950.) In May 2011, Roberts reported that medication relieved his abdominal pain and nausea. (R. at 945.) In June 2011, Roberts reported that his abdominal pain had resolved. (R. at 940.) Examination of Roberts's right shoulder showed restricted range of motion with weakness. (R. at 939-40.) In July 2011, Roberts had right shoulder pain and weakness. (R. at 935.) It was noted that Roberts's hypertension, hyperlipidemia and GERD were stable. (R. at 935.) In August 2011, Roberts reported that his pain medication provided moderate relief and that he was doing exercises using light weights. (R. at 965.)

On October 8, 2011, an MRI of Roberts's right shoulder showed signal abnormalities present within the anterior/interior labrum, mild degenerative changes of the acromioclavicalar joint, small fluid within the subscapular recess and mild marrow edema at the posterior humeral head. (R. at 990.) An MRI of Roberts's left shoulder showed a posterior labral tear with moderate acromioclavicular arthrosis. (R. at 992.) An MRI of Roberts's thoracic spine showed mild disc desiccation and small disc protrusions along with Schmorl's nodes at the T6-T7, T7-T8, T8-T9 and T9-T10 levels without any significant spinal canal or neural foramina compromise and a right T6 vertebral hemangioma. (R. at 987-88, 994-95.) An MRI of Roberts's lumbar spine showed degenerative disc disease at the L4-L5 and L5-S1 levels with mild neural canal and left foraminal stenosis at the L4-L5 level and right paracentral disc extrusion inferiorly at the L5-S1 level causing a right lateral recess stenosis and compression over the right S1 nerve root sleeve. (R. at 987-88, 994-95.) In February 2012, Roberts complained of back and shoulder pain and depression. (R. at 1079.) He reported that his shoulder pain had improved. (R. at 1079.) Roberts stated that he had a firearm and that he

would make a "list to kill other people." (R. at 1079.) In February 2013, a CT scan of Roberts's abdomen and pelvis was normal with the exception of residual colonic contrast. (R. at 1333-34.)

Roberts received treatment for back pain at Wise Chiropractic and Acupuncture from June 2009 through September 2009. (R. at 591-97.) In September 2010, Roberts returned with complaints of low back pain, (R. at 596), and by October 2010, Roberts reported that he was going "good" and had no pain. (R. at 597.)

On December 4, 2010, Dr. James Abrokwah, M.D., examined Roberts at the request of Disability Determination Services. (R. at 599-603.) Dr. Abrokwah reported that Roberts was able to get on and off the couch without difficulty. (R. at 600.) His short- and long-term memory was intact, his thought content and process were within normal limits, and his affect was euthymic. (R. at 600.) Roberts's cervical spine movements were full and pain free; his thoraco-lumbar spine movements were full without vertebral tenderness or scoliosis; his shoulder, elbow, wrist, hand, knee and ankle movements were full and pain free; he had ligament laxity in both shoulders; active and passive hip flexion was reduced on both sides, but other movements were full and pain free; he had normal coordination; he had normal muscle tone and strength; his tendon reflexes were normal and symmetrical; there was no clinical cardiomegaly; and he had normal heart sounds. (R. at 600-01.) Dr. Abrokwah diagnosed chronic back pain, stating that there was no objective evidence to support Roberts's claim, and shoulder problems. (R. at 601.) Dr. Abrokwah noted that Roberts's calf circumference was equal despite his claim of left sciatica. (R. at 601.) Dr. Abrokwah stated that Roberts's pain could not be serious because he did not use even over-the-counter pain medication. (R. at

601.) Dr. Abrokwah opined that Roberts was able to stand for one hour; sit continuously for two hours and a total of seven hours in an eight-hour workday; walk one mile; run half of a mile; occasionally reach above head; crouch frequently; and occasionally lift items weighing up to 25 pounds and 15 pounds frequently. (R. at 602.)

On December 21, 2010, Dr. Robert Keeley, M.D., a state agency physician, found that Roberts had the residual functional capacity to perform medium[7] work. (R. at 169-71.) He opined that Roberts could occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl and frequently climb ramps and stairs and balance. (R. at 170.) No manipulative, visual or communicative limitations were noted. (R. at 170.) Dr. Keeley opined that Roberts should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 171.)

The record shows that Roberts saw James Kegley, M.S., a counselor, for his complaints of depression and anxiety from February 2011 through March 2012. (R. at 774-918, 997-1012.) At a staff screening in January 2011, Roberts stated that he did not like people; that he felt edgy all of the time; that he hated the world and everyone in it; that he easily lost his temper around other people; that he had thoughts of harming himself and other people; and that he felt paranoid in crowds and believed people were watching him. (R. at 805.) John M. Riley, B.S., diagnosed anxiety disorder, major depressive disorder, not elsewhere classified, and impulse control disorder, unspecified. (R. at 805.) Riley assessed Roberts's

---

[7] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2017).

then-current Global Assessment of Functioning, ("GAF"),[8] score at 60,[9] with his highest and lowest GAF score being 65[10] and 55, respectively, within the past six months. (R. at 805.) On February 4, 2011, Roberts reported that he played the guitar and video games. (R. at 780.) He reported that he had no major health problems other than hypertension and joint problems. (R. at 779.) Kegley diagnosed adjustment disorder with mixed anxiety and depression. (R. at 789.) His then-current GAF score was assessed at 50,[11] with his highest and lowest GAF score being 50 within the past six months. (R. at 789.) On February 16, 2011, Roberts reported he lived with his parents since his most recent divorce.[12] (R. at 774.) He stated that his ex-wife was a "pill head," and that she passed away in 2009 from a possible drug overdose. (R. at 774.)

In May 2011, Roberts reported that his major problem was his health and trying to get his disability. (R. at 851.) He stated that he "hates the world and hates the government" because "they will try to screw us" if they can. (R. at 851.) He stated that "illegal aliens," "road rage" and people repeating themselves are the

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

[10] A GAF score of 61-70 indicates "[s]ome mild symptoms ... OR some difficulty in social, occupational, or school functioning ... but generally functioning pretty well ...." DSM-IV at 32.

[11] A GAF score of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning...." *See* DSM-IV at 32.

[12] Roberts reported that he had been married three times. (R. at 1016, 1244.) He stated that his first two marriages ended in divorce. (R. at 805, 1016, 1244.)

issues that made him the most angry. (R. at 850.) Kegley routinely reported that Roberts's mood was mildly depressed with a congruent affect. (R. at 774, 842-43, 853, 855, 858-59, 861, 997-98, 1002, 1007.) In July 2011, Roberts reported that his anger had improved. (R. at 842.) He stated that he was getting out more and playing the guitar with friends. (R. at 842.) In December 2011, Roberts reported that he helped move his girlfriend into her new home. (R. at 1004.) He stated that he had agreed to marry her because he wanted out of his parents' home. (R. at 1004.) In February 2012, Roberts reported that he had to force himself, at times, to get out of bed because he did not "feel happy." (R. at 1001.) He stated that he would get together with his other band members and play music. (R. at 1001.) In March 2012, Roberts reported that he was on his third marriage. (R. at 997.) He stated that, before he married his third wife, he told her that "it's my way or the highway" because "I see it that it's a privilege to be around me." (R. at 997.)

On August 10, 2011, Dr. Thomas Henretta, M.D., a state agency physician, found that Roberts had the residual functional capacity to perform medium work. (R. at 190-91.) He opined that Roberts could occasionally climb ladders, ropes and scaffolds, stoop, kneel, crouch and crawl and frequently climb ramps and stairs and balance. (R. at 190.) No manipulative, visual or communicative limitations were noted. (R. at 191.) Dr. Henretta opined that Roberts should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 191.)

On August 17, 2011, David Tessler, Psy.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), indicating that Roberts had no medically determinable mental impairments. (R. at 198-99.) He noted that Roberts's activities of daily living were limited due to physical impairments only. (R. at 199.)

In February 2012, Roberts was seen at UVA for bilateral shoulder instability and recurrent shoulder dislocations. (R. at 1045-47.) Surgical correction was recommended. (R. at 1046.) In April 2012, Roberts underwent arthroscopic surgery for anterior and posterior labral repair of the right shoulder. (R. at 1030-42.) Roberts participated in physical therapy, (R. at 1104-31), and follow-up treatment notes indicate that Roberts exhibited full elevation on range of motion and was doing well. (R. at 1028, 1100.)

On April 24, 2012, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Roberts at the request of Roberts's attorney. (R. at 1013-24.) The Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), was administered, and Roberts obtained a full-scale IQ score of 72. (R. at 1014.) Lanthorn reported that Roberts displayed no signs of ongoing psychotic processes or evidence of delusional thinking. (R. at 1018.) Roberts reported that he had "some depression" during the previous two years secondary to physical difficulties and pain. (R. at 1018.) Roberts reported that his memory was "all right," but that his concentration had become increasingly erratic. (R. at 1018.) Lanthorn reported that Roberts's mood was best described as "agitated depression." (R. at 1019.) The Minnesota Multiphasic Personality Inventory – 2, ("MMPI-2"), indicated that Roberts had moderate levels of emotional distress characterized by depression, dysphoria, anhedonia, agitation, anxiety and guilt.[13] (R. at 1020, 1022.) The

---

[13] Gary Bennett, Ph.D., a licensed psychologist, who reviewed the medical evidence, noted that the MMPI-2 test should not have been interpreted as Lanthorn interpreted it because it was invalid based on the "F" validity score. (R. at 1020, 1068.) He noted that Lanthorn's explanation for the "F" score did not include one of the most common reasons for such a score, exaggerating symptoms of psychological distress. (R. at 1020-22, 1068.) He also noted that Lanthorn described Roberts's ability to concentrate as poor despite the objective evidence

MMPI-2 indicated that Roberts had problems with concentration, forgetfulness and memory deficits. (R. at 1022.) Lanthorn diagnosed mood disorder with major depressive-like episodes, moderate or greater due to chronic physical problems, pain and limitations; anxiety disorder with generalized anxiety; chronic pain disorder associated with both psychological factors and general medical conditions; and borderline intellectual functioning. (R. at 1022-23.) He assessed Roberts's then-current GAF score at 50. (R. at 1023.)

Lanthorn completed a mental assessment, indicating that Roberts had an unlimited ability to understand, remember and carry out simple job instructions. (R. at 1025-27.) He found that Roberts had a limited, but satisfactory, ability to maintain personal appearance. (R. at 1026.) He found that Roberts was seriously limited in his ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed job instructions; to behave in an emotionally stable manner; to relate predictably in social situations; and to demonstrate reliability. (R. at 1025-26.) Lanthorn found that Roberts had no useful ability to understand, remember and carry out complex job instructions. (R. at 1026.)

On September 18, 2012, Gary Bennett, Ph.D., a licensed clinical psychologist, completed medical interrogatories concerning Roberts's mental impairments. (R. at 1066-69.) He indicated that he had not personally examined Roberts. (R. at 1066.) Bennett reported that a review of the medical evidence indicated that Roberts suffered from an adjustment disorder with mixed anxiety

suggesting no real problems, noting that Roberts finished two fairly long tests with little evidence of difficulty. (R. at 1068.)

and depressed mood; mood disorder, not otherwise specified; an anxiety disorder, not otherwise specified; and a pain disorder associated with both psychological factors and a general medical condition. (R. at 1066.) He opined that Roberts had moderate limitations in his activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; and had experienced no repeated episodes of decompensation of extended duration. (R. at 1067.) Bennett opined that Roberts's impairments did not meet or equal the criteria for any impairment described in the Listing of Impairments. (R. at 1068.) He stated that Roberts would be limited to repetitive, simple one- to two-step tasks in a low-stress work environment in which he would not be expected to meet strict production demands, that did not require interaction with the general public and only occasional interaction with co-workers and supervisors. (R. at 1069.)

Bennett also completed a mental assessment, indicating that Roberts was mildly[14] limited in his ability to understand, remember and carry out simple instructions and to make judgments on simple work-related decisions. (R. at 1063-64.) He found that Roberts was moderately[15] limited in his ability to understand, remember and carry out complex instructions; to interact appropriately with supervisors and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 1063-64.) Bennett found that

---

[14] Mild limitation is defined as a slight limitation, but the individual can generally function well. (R. at 1063.)

[15] Moderate limitation is defined as more than a slight limitation, but the individual can function satisfactorily. (R. at 1063.)

Roberts was markedly[16] limited in his ability to make judgments on complex work-related decisions and to interact appropriately with the public. (R. at 1063-64.) He noted that Roberts was moderately limited in his ability to concentrate. (R. at 1064.) Bennett reported that Roberts began receiving mental health treatment on February 4, 2011; therefore, he would use that date as the onset date for the above limitations. (R. at 1064.)

On September 26, 2012, Roberts established care with Dr. Pema O. Bhutia, M.D., who treated Roberts through February 2015 for shoulder joint laxity; hyperlipidemia, GERD; hypertension; depression; degeneration of the lumbar or lumbosacral interveterbral disc; abdominal pain; unspecified cardiovascular disease; anxiety; and anger management. (R. at 1133-51, 1227-40, 1254-93, 1372-76.) In October 2012, Roberts reported that Paxil was helping his symptoms of anxiety and depression. (R. at 1136.) Roberts identified concerns related to his enjoyment in watching sadistic behavior and fascination with shows about serial killers. (R. at 1136.) Roberts denied intent to harm others. (R. at 1136.) Dr. Bhutia reported that Roberts's mood was mildly irritable, and his affect was appropriate to content. (R. at 1136.) In November 2012, Roberts reported that his depression had improved and that he was tolerating his medication well. (R. at 1133.) Examination of Roberts's right shoulder showed joint laxity and crepitus; he had normal range of motion and no joint instability; he had normal tone, bulk and strength; appropriate judgment; good insight; euthymic mood; and appropriate affect. (R. at 1134-35.)

---

[16] Marked limitation is defined as a serious limitation resulting in a substantial loss in the ability to effectively function. (R. at 1063.)

In February 2013, Roberts complained of abdominal pain associated with nausea and vomiting. (R. at 1227-31.) Dr. Bhutia diagnosed epigastric abdominal pain and esophageal reflux. (R. at 1228.) In May 2013, Roberts reported a stable and improved mood. (R. at 1291.) He made good eye contact, his dress was appropriate, and he had good insight and judgment. (R. at 1291.) In November 2013, Roberts complained of depression and anxiety. (R. at 1287-90.) Roberts had a normal gait; he had mild tenderness to palpation and limited range of motion in the lower lumbar spine; straight leg raising tests were negative; he had normal muscle tone, bulk and strength; appropriate judgment; and good insight. (R. at 1289.)

In January and April 2014, Roberts reported that his mood and anxiety had improved with medication. (R. at 1269, 1282.) He had an appropriate affect and euthymic mood; he made good eye contact; his grooming was appropriate; and his insight and judgment were reported as fair to good. (R. at 1271, 1279.) In May 2014, Roberts complained of chest pain. (R. at 1258.) He stated that his depression and anxiety had improved. (R. at 1260.) In July 2014, Roberts complained of having chest pain since having heart stents placed in June. (R. at 1254-56.) He had normal heart rate and regular rhythm. (R. at 1256.) In February 2015, Roberts complained of chest pain, but refused to go to the emergency room. (R. at 1372-76.) Roberts's heart rate was normal with regular rhythm; he had a normal gait; he had limited range of motion of the shoulders; his neurological examination was normal; he had appropriate judgment and good insight; his recent and remote memory was intact; and he had a euthymic mood and appropriate affect. (R. at 1374.)

On December 7, 2012, Dr. John N. Menio, M.D., completed medical interrogatories concerning Roberts's physical impairments. (R. at 1166-69.) He indicated that he had not personally examined Roberts. (R. at 1166.) Dr. Menio reported that a review of the medical evidence indicated that Roberts suffered from chronic low back pain, history of partial rotator cuff tear of the right shoulder, depression and anxiety. (R. at 1166-67.) He opined that Roberts's impairments did not meet or equal the criteria for any impairment described in the Listing of Impairments. (R. at 1168.) He stated that Roberts would be limited to sedentary work that did not involve climbing, bending, squatting, crouching or lifting or carrying of items weighing more than 10 pounds. (R. at 1169.)

Dr. Menio also completed a medical source statement, indicating that Roberts could frequently lift and carry items weighing up to 10 pounds. (R. at 1159-64.) He found that Roberts could sit for six hours in an eight-hour workday and that he could do so for up to three hours without interruption; stand and/or walk up for up to one hour in an eight-hour workday and that he could do so for up to 30 minutes without interruption; that he could not reach overhead with his right hand, but could continuously reach in all other directions, handle, finger, feel and push and pull; that he could continuously reach, handle, finger, feel and push and pull with the left hand; that he could continuously operate foot controls; that he could never climb, balance, stoop, kneel, crouch or crawl; that he could frequently operate a motor vehicle, work around humidity and wetness, work around dust, odors, fumes and pulmonary irritants, extreme heat and loud noise; that he could occasionally work around moving mechanical parts; and never work around unprotected heights, extreme cold or vibrations; (R. at 1160-63.) He found that these limitations were first present in 2007. (R. at 1164.)

On January 4, 2011, Roberts presented to the emergency room at Norton Community Hospital for complaints of abdominal pain. (R. at 605-12.) An abdominal x-ray showed nonspecific bowel gas pattern. (R. at 610.) A CT scan of Roberts's abdomen and pelvis was normal. (R. at 611.) An echocardiogram was borderline normal. (R. at 742-43.) He was diagnosed with abdominal pain, acute peptic ulcer disease, ("PUD"), and gastritis. (R. at 606.) On January 27, 2013, Roberts presented to the emergency room with complaints of left upper quadrant pain. (R. at 1183-89.) A CT scan of Roberts's abdomen and pelvis showed nonobstructing renal calculi and slight thickening of the wall of the rectosigmoid colon. (R. at 1186.) He was diagnosed with abdominal pain, leukocytosis, mild dysuria and GERD. (R. at 1184.) On February 5, 2013, Roberts presented to the emergency room for complaints of left upper quadrant pain with nausea and vomiting. (R. at 1171-82.) An ultrasound of Roberts's abdomen showed small nonobstructing renal calculi in the right kidney. (R. at 1180.) X-rays of Roberts's gastrointestinal tract were normal. (R. at 1181.) He was diagnosed with abdominal pain, etiology unknown; questionable GERD/PUD; questionable colitis; and irritable bowel syndrome. (R. at 1176.)

On February 7, 2013, Roberts presented to the emergency room at Lonesome Pine Hospital for complaints of abdominal pain, nausea and vomiting. (R. at 1199-1224.) Roberts denied chest pain, dyspnea, dysuria and back pain. (R. at 1202.) His mental status and neurologic examinations were normal. (R. at 1201, 1203.) Roberts had upper abdomen tenderness to palpation. (R. at 1201.) A CT scan of Roberts's abdomen and pelvis was normal. (R. at 1220, 1223.) He was diagnosed with diarrhea, vomiting and acute hypokalemia. (R. at 1203.)

On March 6, 2013, Roberts saw Dr. James L. Lapis, M.D., for complaints of abdominal pain, weight loss and GERD. (R. at 1330-32.) He stated that he was disabled due to arthritis. (R. at 1330.) Dr. Lapis reported that Roberts had a normal gait and station; he had no edema or cyanosis in his extremities; he had normal insight and judgment; and he displayed no evidence of depression, anxiety or agitation. (R. at 1331-32.) Dr. Lapis diagnosed left upper quadrant abdominal pain, diarrhea, nausea and vomiting. (R. at 1332.) On March 11, 2013, an endoscopy and colonoscopy were normal. (R. at 1324-26.) On July 11, 2013, Roberts reported problems with alternating constipation and diarrhea and left upper quadrant pain with nausea. (R. at 1327-29.) He also complained of chest pain and shortness of breath with exertion; back pain; anxiety and depression. (R. at 1328.) He denied an inability to concentrate. (R. at 1328.) Dr. Lapis reported that Roberts had a normal gait and station; he had no edema or cyanosis in his extremities; he had normal insight and judgment; and he displayed no evidence of depression, anxiety or agitation. (R. at 1328-29.) On July 17, 2013, an abdominal sonogram showed mild diffuse hepatic fatty infiltration and a normal gallbladder. (R. at 1322.) On March 17, 2015, Roberts complained of abdominal pain with nausea and vomiting. (R. at 1384-86.) He denied constipation, diarrhea, depression, anxiety and an inability to concentrate. (R. at 1385.) His examination was normal. (R. at 1385-86.) Dr. Lapis diagnosed nausea and vomiting, irritable bowel, diarrhea and depression. (R. at 1386.)

On March 14, 2013, Lanthorn evaluated Roberts again at the request of Roberts's attorney. (R. at 1242-53.) The WAIS-IV was administered, and Roberts obtained a full-scale IQ score of 77. (R. at 1243.) Lanthorn reported that Roberts displayed no signs of ongoing psychotic processes or evidence of delusional thinking. (R. at 1246.) Roberts reported depression and anxiety. (R. at 1246.)

Roberts reported that his memory was "fair," but that his concentration was "not that good." (R. at 1247.) Lanthorn reported that the MMPI-2 was administered, which generated an "entirely valid" profile, which, essentially, reaffirmed the results of his prior MMPI-2 profile. (R. at 1252.) Lanthorn diagnosed mood disorder with major depressive-like episode, due to chronic physical problems, pain and limitations; anxiety disorder with generalized anxiety; pain disorder associated with both psychological factors and general medical conditions; and borderline intellectual functioning. (R. at 1251.) He assessed Roberts's then-current GAF score at 50. (R. at 1251.) Lanthorn reported that the results of this evaluation were substantially identical to the one performed in April 2012. (R. at 1252.)

On November 25, 2014, Dr. Louis A. Fuchs, M.D., completed medical interrogatories concerning Roberts's physical impairments. (R. at 1362-64.) He indicated that he had not personally examined Roberts. (R. at 1362.) Dr. Fuchs reported that a review of the medical evidence indicated that Roberts suffered from bilateral shoulder ligamental laxity and status-post arthroscopic labral repair on the right. (R. at 1362.) He opined that Roberts's impairments did not meet or equal the criteria for any impairment described in the Listing of Impairments. (R. at 1363.) He opined that Roberts could continuously lift and carry items weighing up to 20 pounds and occasionally lift and carry items weighing up to 50 pounds. (R. at 1364-65.) He found that Roberts could sit for eight hours in an eight-hour workday and that he could do so for up to two hours without interruption; stand and/or walk up for up to four hours in an eight-hour workday and that he could do so for up to two hours without interruption; that he could occasionally reach overhead, but could continuously reach in all other directions, handle, finger, feel and push and pull; that he could continuously operate foot controls; that he could continuously

climb stairs and ramps, balance, stoop, kneel, crouch or crawl and frequently climb ladders or scaffolds; that he could continuously work around unprotected heights, moving mechanical parts, humidity and wetness, extreme cold and heat, vibrations and operate a motor vehicle. (R. at 1366-69.)

The record shows that Dr. Orson D. Go, M.D., treated Roberts from May 2014 through April 2016 for coronary heart disease and chest pain. (R. at 8-21, 1294-1320.) Due to Roberts's symptoms of chest discomfort, Dr. Go sent Roberts for a stress study, which showed anterior ischemia and mild left ventricle systolic dysfunction. (R. at 1267-68, 1297.) In June 2014, an echocardiogram showed 55 to 60 percent ejection fraction. (R. at 1262-64, 1319.) In June 2014, a cardiac catheterization showed three-vessel coronary artery disease, with critical disease only involving the ramus intermedius artery; the left anterior descending distal had 50 percent disease, with the diagonal branches being free of disease; the left circumflex artery vessel and its branches were free of disease; and the right coronary artery had several areas of stenosis with as much as 50 percent in the mid vessel (R. at 1297, 1316-18.)

In June 2014, Roberts underwent a successful percutaneous coronary intervention and stenting with a drug eluting stent, and he was on dual antiplatelet therapy. (R. at 1297, 1316-18.) On June 19, 2014, Roberts reported that he was asymptomatic since the stenting and he denied symptoms of ischemia, arrhythmia or heart failure. (R. at 1297.) Dr. Go diagnosed moderate three-vessel coronary artery disease and tobacco use. (R. at 1299.) On August 8, 2014, Roberts complained of occasional chest discomfort triggered by stress since the stenting. (R. at 1294.) On October 15, 2014, Dr. Go indicated that Roberts met the listing for coronary artery disease found at § 4.04(C). (R. at 1336.) On March 18, 2015,

Roberts complained of intermittent episodes of chest discomfort that lasted for seconds with no unstable features. (R. at 1388, 1391.) He reported shortness of breath on exertion, but denied orthopnea, paroxysmal nocturnal dyspnea, syncope and edema. (R. at 1388.) Dr. Go reported that Roberts was not in cardiorespiratory distress. (R. at 1390.) Dr. Go diagnosed moderate three-vessel coronary artery disease, status-post percutaneous coronary intervention and stenting, chest pain and hypertension. (R. at 1391.) Dr. Go repeatedly reported that Roberts was not in cardiorespiratory distress. (R. at 1299, 1302, 1305, 1308, 1390.)

On April 11, 2016, Dr. Go saw Roberts for complaints of occasional chest discomfort, dyspnea on exertion and palpitations. (R. at 8-12.) Roberts reported that he experienced an episode of chest discomfort in February that required him to take three nitroglycerines before he noticed improvement. (R. at 8.) Dr. Go reported that Roberts was in no cardiorespiratory distress. (R. at 10.) Dr. Go diagnosed moderate three-vessel coronary artery disease; status post percutaneous coronary intervention; chest pain; and hypertension. (R. at 11.) Dr. Go ordered an exercise stress perfusion study. (R. at 11.) An exercise nuclear stress study was performed on April 25, 2016, which was normal. (R. at 15-21.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant

work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Roberts argues that the ALJ erred by failing to find that his condition met or equaled the listed impairment for ischemic heart disease found at § 4.04(C) of the Listing of Impairments. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 9-10.) Roberts also argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Brief at 6-9.) In particular, Roberts argues that the ALJ should have given controlling weight to the opinions of Dr. Menio, Dr. Go and Lanthorn. (Plaintiff's Brief at 8-9.) Roberts also argues that the ALJ failed to give appropriate weight to the previous ALJ's decision, which gave a more restrictive residual functional capacity. (Plaintiff's Brief at 6, 9.)

To qualify for benefits based on the listed impairment for ischemic heart disease, found at 20 C.F.R. Pt. 404, Subpt. B, App. 1, § 4.04(C), a claimant must show ischemic heart disease with symptoms due to myocardial ischemia with:

> C. Coronary artery disease, demonstrated by angiography (obtained independent of Social Security disability evaluation) or other appropriate medically acceptable imaging, and in the absence of

a timely exercise tolerance test or a timely normal drug-induced stress test, an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that performance of exercise tolerance testing would present significant risk to the individual, with both 1 and 2:

1. Angiographic evidence showing:
   a. 50 percent or more narrowing of a nonbypassed left main coronary artery; or
   b. 70 percent or more narrowing of another nonbypassed coronary artery; or
   c. 50 percent or more narrowing involving a long (greater than 1 cm) segment of a nonbypassed coronary artery; or
   d. 50 percent or more narrowing of at least two nonbypassed coronary arteries; or
   e. 70 percent or more narrowing of a bypass graft vessel; and
2. Resulting in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living.

*See* 20 CFR 404, Subpt. P, App. 1, § 4.04(C).

In reaching his decision that Roberts's condition did not meet or equal § 4.04(C), the ALJ stated that he was giving Dr. Go's opinion little weight because it was not supported by his own treatment records, which revealed only subjective complaints of chest discomfort with minimal objective findings. (R. at 42.) He also noted that Dr. Go's opinion was "quite conclusory, providing very little explanation of the evidence relied on in forming that opinion." (R. at 42.) The ALJ found that Dr. Go's opinion was contrary to and not supported by the other evidence of record. (R. at 42.) Following Roberts's stent procedure, Dr. Go's follow-up treatment notes showed that Roberts was asymptomatic since the

percutaneous coronary intervention and stenting and that he denied symptoms of ischemia, arrhythmia or heart failure. (R. at 1297.) In August 2014, Roberts reported that he only occasionally had chest discomfort usually caused by stress. (R. at 1294.) At that time, Dr. Go noted that Roberts had no unstable features. (R. at 1296.) Despite this, Dr. Go assessed, in a check box form, that Roberts's cardiac condition met Listing 4.04(C). (R. at 1336.)

Courts within this Circuit have found that such conclusory check box reports are not strong evidence of disability. *See*, *e.g*, *Shelton v. Colvin*, 2015 WL 1276903, *3 (W.D. Va. Mar. 20, 2015) ("The magistrate judge is correct in stating these checkbox forms are of limited probative value."); *Leonard v. Astrue*, 2012 WL 4404508, at *4 (W.D. Va. Sept. 25, 2012) (same); *Bishop v. Astrue*, 2012 WL 951775, at *3 n.5 (D.S.C. Mar. 20, 2012) ("The court notes that '[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.'"); *Siddons v. Colvin*, 2014 WL 6893802, at *11 (E.D.N.C. Dec. 5, 2014) ("[f]orm reports such as questionnaires are arguably entitled to little weight due to the lack of explanation"); *Norman v. Comm'r of Social Sec.*, 2014 WL 5365290, at *27 (N.D.W.Va. Oct. 21, 2014) ("the undersigned notes that the majority of this questionnaire was in a 'check off' form, which has been referred to by other courts as 'weak evidence at best.'"); *McGlothlen v. Astrue*, 2012 WL 3647411, at *6 (E.D.N.C. Aug. 23, 2012) (finding a form questionnaire "entitled to little weight" due to the lack of substantive explanation.); *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993).

The ALJ noted that Dr. Go's opinion was conclusory and not supported by the other evidence of record. (R. at 42.) On June 12, 2014, a cardiac catheterization showed three-vessel coronary artery disease, with critical disease only involving

the ramus intermedius artery. (R. at 1297, 1316-18.) Dr. Go reported that Roberts underwent a successful percutaneous coronary intervention and stenting with a drug eluting stent. (R. at 1297.) On June 19, 2014, Roberts reported that he was asymptomatic since the stenting, and he denied symptoms of ischemia, arrhythmia or heart failure. (R. at 1297.) Subsequent office visits show that Roberts regularly reported only intermittent episodes of chest discomfort. (R. at 8, 1294, 1388, 1391.) Dr. Go routinely reported that Roberts was not in cardiorespiratory distress. (R. at 10, 1299, 1302, 1305, 1308, 1390.) In addition, in July 2014 and February 2015, Dr. Bhutia reported that Roberts's cardiovascular examination showed normal heart rate and regular rhythm. (R. at 1256, 1374.) Dr. Fuchs opined that Roberts's impairments did not meet or equal the criteria for any impairment described in the listing of impairments. (R. at 1363.)

Furthermore, the record does not demonstrate serious limitations in Roberts's abilities to initiate, sustain or complete activities of daily living. Roberts reported that he played in a band and went shopping with his wife and stepchildren. (R. at 469, 839, 842, 850, 1001, 1012.) Roberts stated that he needed assistance only with getting in and out of the shower, shaving his head and, at times, drying his head and upper body. (R. at 57.) He stated that he could vacuum, put away his laundry and perform simple household repairs. (R. at 467.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Roberts's impairment did not meet or equal the Listing at § 4.04(C).

Roberts also argues that the ALJ erred by failing to give controlling weight to the findings of Dr. Menio and Lanthorn. (Plaintiff's Brief at 8-9.) It is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456;

*Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

It is well-settled that, in determining whether substantial evidence supports the ALJ's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40. "[T]he [Commissioner] must indicate explicitly that all relevant evidence has been weighed and its weight." *Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). "The courts … face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence. Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

The ALJ found that Roberts had the residual functional capacity to occasionally lift and carry items weighing up to 50 pounds and 20 pounds continuously; sit for eight hours in an eight-hour workday, but only two hours at one time without interruption; and stand and/or walk for a total of four hours in an

eight-hour workday, but only for two hours at one time without interruption. (R. at 35.) In addition, the ALJ found that Roberts could occasionally reach overhead with his bilateral upper extremities and continuously reach in all other directions; that he could continuously handle, finger, feel, push and pull, use his bilateral lower extremities to operate foot controls, climb stairs and ramps, balance, stoop, kneel, crouch and crawl; that he could frequently climb ladders and scaffolds; that he could continuously tolerate exposure to environmental conditions, such as unprotected heights, moving mechanical parts, vibrations, extreme temperatures and pulmonary irritants; and that he would be limited to simple one- to two-step jobs with little interaction with co-workers and no interaction with the general public. (R. at 35.) The ALJ stated that he was giving Dr. Menio's opinion "little weight" because it was not consistent with the medical record, the objective clinical findings, the residual functional capacity established and the record as a whole. (R. at 41.) The ALJ gave Lanthorn's assessments "little weight" because they were inconsistent with his own objective testing, the medical evidence of record and the record as a whole. (R. at 41.) The ALJ noted that Lanthorn found that Roberts had a serious limitation in his ability to maintain attention and concentration. (R. at 41.)

In arguing against the ALJ's assessment, Roberts points to the consultative examination of Dr. Abrokwah. (Plaintiff's Brief at 6-7). It is noted that Dr. Abrokwah stated that there was no objective evidence to support Roberts's allegations of back pain. (R. at 601.) He further stated that Roberts's "pain cannot be serious because he does not use even OTC analgesia." (R. at 601.) Dr. Abrokwah found that Roberts's cervical spine and thoracolumbar spine movements were full with no tenderness; he had normal coordination, muscle tone and strength; and his reflexes were normal and symmetrical. (R. at 600-01.) In March

2013, Dr. Lapis found that Roberts's examination was normal, including a normal gait and station. (R. at 1331.) In November 2013, Dr. Bhutia found that Roberts had a normal gait; mild tenderness to palpation and limited range of motion in the lower lumbar spine; negative straight leg raising tests; and normal tone, bulk and strength. (R. at 1289.) In July 2014 and February 2015, Dr. Bhutia found that Roberts had a normal gait, limited range of motion in his shoulders and normal neurological examination. (R. at 1256, 1374.) In March 2015, Dr. Lapis again found that Roberts's examination was normal. (R. at 1385-86.) The ALJ gave greater weight to the assessment of Dr. Fuchs because it was consistent with and supported by the medical evidence, the objective clinical findings and the record as a whole. (R. at 42.) The ALJ found that Dr. Fuchs's assessment was consistent with the assessments of the two state agency physicians. (R. at 42.)

Roberts also points to Lanthorn's evaluations. (Plaintiff's Brief at 7-8.) The ALJ stated that he was giving "little weight" to Lanthorn's assessments because they were inconsistent with his own objective testing, the medical evidence of record and the record as a whole. (R. at 41.) The ALJ noted that Lanthorn found that Roberts had serious limitations in his ability to maintain attention and concentration; however, objective evidence suggested that Roberts did not have any real problems in maintaining attention and concentration, as evidenced by Roberts being able to complete two fairly long tests. (R. at 41.)  The ALJ gave more weight to Bennett's assessment because it was consistent with and supported by the objective medical evidence, clinical findings and the record as a whole. (R. at 41.)

Kegley repeatedly reported that Roberts's mood was mildly depressed with a congruent affect. (R. at 774, 842-43, 853, 855, 858-59, 861, 997-98, 1002, 1007.)

The record shows that Roberts repeatedly reported that his symptoms of anxiety, depression and anger improved with medication. (R. at 616, 842, 950, 1133, 1136, 1260, 1269, 1282, 1291.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). In addition, Dr. Lapis reported in 2013 that there was no evidence of depression, anxiety or agitation present. (R. at 1329, 1332.) In July 2013, Roberts denied an inability to concentrate. (R. at 1328.) Dr. Lapis reported that Roberts's judgment and insight were normal. (R. at 1329.) In March 2015, Roberts denied depression, anxiety and an inability to concentrate. (R. ate 1385.) Dr. Abrokwah noted that Roberts's short- and long-term memory was intact, and his thought content and process was normal. (R. at 600.) Dr. Bhutia noted that Roberts had appropriate judgment, good insight, appropriate affect and intact recent and remote memory. (R. at 1135, 1374.) Based on this, I find that the ALJ properly weighed the psychological evidence of record.

Finally, Roberts argues that the ALJ failed to give appropriate weight to the previous ALJ's decision, which gave a more restrictive residual functional capacity. (Plaintiff's Brief at 6, 9.) I find this argument to be unpersuasive. The prior ALJ's decision was vacated by the Appeals Council; (R. at 227-30), thus, the ALJ's decision, having been vacated, never became final. Therefore, the doctrine of res judicata does not apply. *See Monroe v. Colvin*, 826 F.3d 176, 187 (4th Cir. 2016); *see also Batson v. Colvin*, 2015 WL 1000791, at *7 (E.D.N.C. Mar. 5, 2015) ("Here, *Albright* and AR 00–1(4) did not require the second ALJ to consider the first ALJ's decision because that decision had been vacated, and thus no finding remained to be considered in the subsequent determination."); *Sanford v. Colvin*, 2016 WL 951539, at *3 (M.D.N.C. Mar. 9, 2016)("[T]he ALJ's prior

decision had no preclusive effect on the decision at issue here, as the 2011 decision was vacated and a new hearing was conducted.").

Based on the above-stated reasons, I find that the substantial evidence supports the Commissioner's decision that Roberts was not disabled. An appropriate Order and Judgment will be entered.

DATED:     December 6, 2017.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE